NOTICE

Decision filed 07/21/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 240539-U

NOS. 5-24-0539, 5-24-0540, 5-24-0541 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | De Witt County. |
| | ) | |
| v. | ) | Nos. 23-CF-135, 23-CF-136, |
| | ) | 23-CF-137 |
| JOSHUA RETZER, | ) | |
| | ) | Honorable Karle E. Koritz, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE CLARKE* delivered the judgment of the court.
Presiding Justice Cates and Justice Barberis concurred in the judgment.

**ORDER**

¶ 1 *Held*: The defendant's convictions are affirmed where the trial court found the victims' testimony highly credible and the evidence sufficient to prove his guilt beyond a reasonable doubt. Additionally, defense counsel's failure to object to the admission of irrelevant photographs did not result in prejudice to the defendant.

¶ 2 In this consolidated appeal, the defendant, Joshua Retzer, was convicted following a jury trial in the circuit court of De Witt County of 14 counts of predatory criminal sexual assault of a child (PCSAC), 3 counts of criminal sexual assault (CSA), 3 counts of aggravated criminal sexual abuse (ACSA), 1 count of indecent solicitation of a child (ISC), and 1 count of sexual relations within families (SRF). Thereafter, the defendant was sentenced to 14 consecutive natural life terms

_____

*Justice Moore was originally assigned to the panel before his retirement. Justice Clarke was substituted on the panel and has read the briefs.

1

in the Illinois Department of Corrections for the PCSAC charges, plus other concurrent and consecutive sentences on the remaining charges. In this direct appeal, the defendant contends that the State did not prove him guilty beyond a reasonable doubt and that his counsel was ineffective for failing to object to the admission of photographs depicting bomb-making books in his garage.

¶ 3                                    I. BACKGROUND

¶ 4       On December 15, 2023, the defendant was charged by information in case Nos. 23-CF-135, 23-CF-136, and 23-CF-137. In case No. 23-CF-135, the defendant was charged with crimes against his daughter S.R.R. The charges included one count of PCSAC, a Class X felony (720 ILCS 5/11-1.40(a)(1) (West 2022)), and one count of ISC, a Class 1 felony (*id.* § 11-6(a)). In case No. 23-CF-136, the defendant was charged with crimes against his daughter C.R. The charges included four counts of PCSAC, Class X felonies (*id.* § 11-1.40(a)(1)), four counts of CSA, Class 1 felonies (*id.* § 11-1.20(a)(3)), and two counts of ACSA, Class 2 felonies (*id.* § 11-1.60(b)). In case No. 23-CF-137, the defendant was charged with crimes against his daughter S.M.R. The charges included nine counts of PCSAC, Class X felonies (*id.* § 11-1.40(a)(1)), four counts of CSA, Class 1 felonies (*id.* § 11-1.20(a)(3)), two counts of ACSA, Class 2 felonies (*id.* § 11-1.60(b)), and one count of SRF, a Class 3 felony (*id.* § 11-11(a)). All of the charges were alleged to have occurred between March 22, 2008, when S.M.R. turned 9 years old, and April 16, 2022, when S.R.R., the youngest of the three victims, was 11 years old. All three cases were joined for trial. Before trial, the State also dismissed three counts of CSA in case No. 23-CF-137 and two counts of CSA in case No. 23-CF-136.

¶ 5       Testimony in the trial began on February 14, 2024. S.M.R. was the State's first witness. She testified that her date of birth is March 22, 1999, that she is the defendant's oldest daughter, and that she has 11 living siblings. She knew the defendant's date of birth to be September 2, 1981,

2

or 1982. Her family moved to their home on West Clay Street in Clinton, Illinois, in February of 2008. S.M.R. explained that she attended public school until the end of her fifth-grade year, when the defendant decided to homeschool the children. S.M.R. testified that she mostly taught herself and had to teach her younger siblings as well. The family also attended a local church until roughly a year or two after the children were taken out of public school. After the children were taken out of school and stopped attending church, S.M.R. explained that most of their social interactions were within the household.

¶ 6    S.M.R. also described the layout of the home and the attached garage. The State presented S.M.R. with People's Group Exhibit 1A, which consisted of 90 photographs of the home taken by Detective David Morris. When the State moved to admit the exhibit, the defense objected, and the court conducted an off-the-record discussion. Upon returning to the record, the court stated that the defense had challenged the relevance of photographs 21, 22, 23, and 24. The court sustained the objection, and Exhibit 1A was admitted and published to the jury with those four photographs excluded.

¶ 7    Excluding photographs 21 through 24, S.M.R. explained that the home included a dining room, a family room, a kitchen, a laundry room, a sitting room, three bedrooms, and two indoor bathrooms. The photographs also showed an attached garage with an additional bathroom. That garage space contained a small alcove the family referred to as the "man corner," where the defendant sometimes drank alcohol. Instead of doors, the rooms were separated by curtains or blankets covering the doorways. One bathroom was on the main floor, and the second was on the second floor. The bedrooms were also on the second floor: one for the girls, another for the boys, and the master bedroom for the parents.

3

¶ 8    The photographs also depicted several additional details within the home and garage. These included height markers for the children written on the kitchen wall, a Mother's Day poster, and couch cushions on the floor. Other images showed a close-up of the wallpaper border in the master bedroom and photographs displayed on a mantel or shelving unit.

¶ 9    The garage photographs showed a dry-erase board and various poems and writings on the walls of the garage bathroom. The garage photographs further showed beer cans, cigarette cartons, bottles containing clear liquids, and a travel mug. They also captured a variety of books, CDs, and cassette tapes, including titles such as "Advanced Dungeons & Dragons Player's Handbook," "The Anarchist Cookbook," "The Poor Man's James Bond" volumes 1 and 2, "Building a Family That Will Stand: Blueprints for Biblical Fatherhood & Multi-Generational Thinking," "The Four Ps: Is He Ready to Lead," "Give Me Your Heart, My Son," "Preparing Sons to Provide for a Single-Income Family," "How to Evaluate a Suitor," "Manager of His Home: Helping Your Wife Succeed as She Manages Your Home," "The League of Grateful Sons," "Manly Friendships," "Bonhoeffer: The Cost of Freedom," and several volumes of "Monty Python's Flying Circus." Three photographs also showed highlighted text inside "The Poor Man's James Bond," volumes 1 and 2.

¶ 10    The State next presented S.M.R. with People's Exhibits 2 and 2A, which consisted of photographs of the schedules the defendant created for the children. These schedules set out specific times for waking up, meals, educational activities, chores, bathroom and shower use, and bedtime. They organized the children's entire day in increments ranging from 5 to 15 minutes. Both exhibits were admitted into evidence, and Exhibit 2 was published to the jury without objection.

¶ 11     S.M.R. testified that everyone in the household was required to follow the schedules and that failure to do so resulted in punishment. The punishments included being yelled at, losing privileges, or being spanked. According to S.M.R., the spankings were administered with dowel rods approximately a foot and a half long and between one-half and one-quarter inch in diameter. These rods were kept in multiple rooms throughout the house for easy access.

¶ 12     S.M.R. explained that when she was younger before the sexual activity began, she was close with the defendant; "[she] wanted to try to do anything to get his approval and adulation." Because S.M.R. was the oldest child, she was typically responsible for caring for her younger siblings. Her mother was often occupied with the younger children, running errands such as grocery shopping, taking children to appointments, or handling tasks the children could not do. Once her mother finished breastfeeding each baby, the responsibility for that child usually shifted to S.M.R. If she was unavailable or with her father, the next oldest sibling assumed responsibility.

¶ 13     S.M.R. testified that the inappropriate contact from her father began shortly after moving into the Clay Street house in 2008, when she was nine years old. At first, the defendant called S.M.R. out to the garage, where he had her put on a thong and babydoll top, which he said was her mother's. After she put on the clothing, the defendant told her that she "looked pretty" and "looked like [her] mom when she was younger." The defendant told S.M.R. not to tell her mom about trying on the clothes because they were hers and her mom might get upset. S.M.R. explained that wearing the lingerie made her uncomfortable.

¶ 14     Shortly after the lingerie incident, later in 2008, the defendant began "very regularly," "[e]their daily or multiple times a week," groping and fondling S.M.R.'s breasts. This continued until S.M.R. moved out in January 2020. When asked, S.M.R. stated that these inappropriate acts occurred in most of the downstairs rooms, after the defendant sent her siblings to other rooms to

5

do laundry or to watch a movie. The defendant also sometimes would call S.M.R. out to the garage to touch her. She explained that the defendant touched her breasts with his hands and mouth. S.M.R. further explained that when she started puberty but before she was fully developed, "fairly regularly," the defendant would tell her to take her clothes off and would look at and touch her breasts and look at her pubic hair to "make sure everything was looking okay and that it was growing correctly." S.M.R. stated that the defendant would also semi-regularly, a couple times a month, have her sit on his lap, directly over his groin, and that she could "feel his erection." S.M.R. also described an instance where the defendant called her out to the garage and told her the biblical story of "Lot." The defendant told her that Lot and his daughters were in a cave, and they did not have husbands, so they got their father drunk on wine so they could sleep with him to become pregnant.

¶ 15     S.M.R. testified that the defendant often required her and her younger sister, C.R., to give him massages. S.M.R. explained that the photograph of couch cushions on the floor was representative of how the defendant would lie in the family room when he would have her and her siblings give him massages. The defendant would also summon S.M.R. upstairs himself, or through her siblings, to give him massages in the master bedroom. The full body massages would occur "a couple times a week," but the defendant would have them massage his back or feet "almost on a daily basis." At times during the massages, and on other occasions, beginning when S.M.R. was "[m]aybe 10," the defendant would put his hand in S.M.R.'s underwear, put his fingers into her vagina, grab her breasts, or move her hand down to his groin. This occurred during massages in the master bedroom and the family room, when he would send her siblings out of the room to do chores. Sometimes her very young siblings would be in the family room when this occurred. These contacts with the defendant in the family room would occur once or twice a month.

6

S.M.R. explained that when she was massaging the defendant in the master bedroom, she usually knelt on the floor next to the bed, as she did when she massaged him on the couch cushions in the family room, at which point he would reach down to touch her. These inappropriate interactions continued until S.M.R. moved out at age 20.

¶ 16    S.M.R. testified that the defendant's behavior progressed beyond penetrating her with his fingers. On two consecutive Mother's Days when S.M.R. was 10 and 11 years old or 11 and 12 years old, the defendant used his mouth and tongue on her vagina after getting her out of bed before everyone else in the home, under the guise of making breakfast and cleaning the kitchen. These acts occurred at the base of the staircase leading up to the bedrooms. The defendant in the master bedroom on two or three occasions also placed his penis in S.M.R.'s mouth before she was 12 years old. The defendant texted S.M.R. and told her to come upstairs, and when she entered the room, he told "[her] to get down on [her] knees" and then "he pulled his pants down and told [her] to put it in [her] mouth." The defendant told S.M.R. later that he had her do that because "[her] mom wouldn't give him blow jobs," because her mother had a "bad experience with a previous boyfriend when she was in high school."

¶ 17    On two other occasions in the master bedroom, when S.M.R. was "right around" 12 years old, the defendant penetrated her vagina with his penis. During these inappropriate acts, S.M.R.'s mother was out of the house. After her mother left, the defendant told S.M.R. to come upstairs to the master bedroom; when she entered the room, he told her to take off her clothes. The defendant explained that he "just had to get that out of his system and if [she] let him do that then everything else would stop." As S.M.R. lay on the bed as the defendant penetrated her, she explained that she stared at the angels on the wallpaper at the top of the walls, "imagining that [the angels] had their wings around [her] and were taking [her] away." S.M.R. testified that she knew that the defendant

7

ejaculated because "he made fun of [her] later" about it because "[she] thought he had fallen asleep." A couple of days later, the defendant told her that "it hadn't worked the first time because he was too drunk and so he needed to do it a second time." S.M.R. confirmed that the second instance was substantially the same as the first time.

¶ 18    S.M.R. explained that she believed she was the only victim until C.R. told her that the defendant was doing similar things to her. In April of 2022, after S.M.R. found out the defendant was doing similar things to C.R., she disclosed the information to her mother. S.M.R. had not told anyone before because the defendant told her that "if [she] ever said anything to anybody [the Department of Children and Family Services] would come and take all the siblings and separate [them]." Once S.M.R.'s mother was made aware of what was happening, she kicked the defendant out of the family home and initiated divorce proceedings. S.M.R. explained that, during the divorce proceedings, without having been informed of the inappropriate contact, the defendant was given supervised visitation with the children. It was not until C.R. was hospitalized in a mental health facility for suicidal ideation that the police became aware of the inappropriate contact by the defendant.

¶ 19    C.R. testified that the defendant is her father and that she was born on November 21, 2006. She is the second-oldest daughter, approximately seven years younger than S.M.R. Until moving out in 2022, C.R. lived with the family at their home on West Clay Street in Clinton, Illinois.

¶ 20    C.R. explained that the inappropriate contact from her father began before she had turned 10 years old. She testified that the defendant "would frequently mess with [her] vagina and tried to get [her] to mess with his penis." The defendant also would look at her and touch the inside and outside of her vagina and grab her breasts daily while she was naked in the shower. C.R. explained that on one occasion in the bathroom, when she was a preteen, the defendant put his penis in C.R.'s

8

mouth and "did the thing where the stuff comes out." When asked to describe what the "stuff" looked like, C.R. explained that she could not see it; she could only feel it, and that it felt like "someone was pouring thick water into [her] mouth." These inappropriate contacts in the bathroom continued until the defendant was kicked out of the house when C.R. was 15 years old. C.R. explained that the defendant's inappropriate contact was not confined to the bathroom; it also occurred in the family room, the sitting room, the kitchen, and the master bedroom.

¶ 21    C.R. explained that in the family room the defendant frequently would cover himself with a blanket and try to get her to touch his penis, or he would do so when he had C.R. massage him. C.R. also testified that S.M.R. and S.R.R. also massaged the defendant in the family room. C.R. explained that on one occasion in the family room, the defendant was lying on an air mattress, and he "had [her] remove [her] bottoms, or he moved them, but moved them so they weren't in the way" and had her "sit on him" and touched his penis to the inside and outside of her vagina. On another occasion before C.R. was 11 years old, the defendant put his mouth on her vagina. These inappropriate contacts in the family room also continued until the defendant was kicked out of the home.

¶ 22    In the sitting room almost daily, beginning before the incident when defendant had placed his penis in C.R.'s vagina in the family room, the defendant had C.R. sit on his lap, and he would "stick his fingers in [her] vagina." These inappropriate contacts in the sitting room also continued until the defendant was kicked out of the home.

¶ 23    Daily, beginning before C.R. was 10 years old, in the kitchen, the defendant would grab C.R.'s buttocks and give her hugs. C.R. explained that when the defendant hugged her, she would "put [her] arms up" so her chest "wouldn't touch him." In response to C.R. lifting her arms, the

9

defendant would tell her to "stop blocking." These inappropriate contacts in the kitchen also continued until around the time the defendant was kicked out of the home.

¶ 24   C.R. explained that daily the defendant would text someone in the home and tell her to go upstairs to massage him. Almost every time C.R. gave the defendant a massage, he had her touch his penis with her hands. Frequently, while she was in the master bedroom for the massages, the defendant touched C.R.'s vagina with his fingers and penis. These inappropriate contacts in the master bedroom began when C.R. was 10 years old and continued until "around" the time the defendant was kicked out of the family home.

¶ 25   The last time the defendant touched C.R. inappropriately was the day he was kicked out of the house, when he tried to stick his hand up C.R.'s shirt, and as she was moving away, he scratched her torso. After being scratched, C.R. told her sister, S.M.R., who told their mother; however, C.R. did not disclose the other sexual contacts. In September of 2023, while at a mental health facility, C.R. stated she made a report to the staff about the defendant's other inappropriate contacts with her. As a result of her disclosure, the law-enforcement investigation began.

¶ 26   S.R.R. testified that the defendant is her father, her date of birth is August 23, 2010, and she lives at the family home on West Clay Street in Clinton, Illinois. S.R.R. testified that beginning in 2021, every Sunday when the defendant was living at the home, he would touch her breasts and vagina. S.R.R. explained that these inappropriate contacts occurred when she would give her father massages in the master bedroom.

¶ 27   S.R.R. further explained that the defendant would text one of her brothers and would tell them to send her up to him. When S.R.R. would enter the room, the defendant would lie on the bed, and she would massage his arms, back, and sometimes legs, and he would touch her. S.R.R. reported that sometimes when she would massage the defendant, he "would say, [C.R.'s] a girl

10

and she always sat a specific way," or "[C.R.] and [S.M.R.] always sat a specific way" while massaging him. The defendant then would make her sit in that position, and would reach into her clothing and touch in and on her vagina. S.R.R. reported that there were other occasions where the defendant would touch her without being in that particular position. S.R.R. also testified that there were other occasions when the defendant touched her while her mother was asleep in the bedroom. These inappropriate contacts in the master bedroom continued every Sunday until the defendant was kicked out of the family home.

¶ 28    In addition, S.R.R. explained that in November or December of 2021, while in the kitchen, the defendant asked her five to six times to go to the garage with him to have sex. She reported that they did not have sex in the garage. S.R.R. also testified that after she was ordered to have supervised visitation with the defendant, she had told him about a dream she had where she was pregnant and he hugged her and whispered in her ear "not yet."

¶ 29    L.R., the defendant's oldest son and 21 years old at the time of trial, testified that he moved out of the family home in December 2021. He described his daily routine while living there as highly structured, organized into precise increments. The children were required to complete assigned tasks within specific time limits, and the schedule dictated when they could eat or use the bathroom. According to L.R., "[a]ll moments of the day were scheduled and all parts of the day were to be accounted for at all times." If the children failed to follow the schedule, the defendant punished them by using a rod kept in each room, taking away their belongings, or revoking their limited free time. L.R. also explained that when the defendant was occupied, the older children were expected to look after the younger ones.

¶ 30    L.R. further testified that he and his siblings were generally not allowed to socialize outside the home and were often prohibited from playing outdoors. He and S.M.R. were responsible for

11

ensuring that the younger children did not interact with neighborhood children or other people. Although he could sometimes see outside through uncovered windows, most windows in the home were covered to prevent distractions and to avoid being observed. L.R. also recalled overhearing the defendant and his mother argue about the defendant's parenting practices and about his mother's subordinate role in the household.

¶ 31 L.R. also described his education in the home. He noted that although he briefly attended public school early in life, he had no memory of it. At home, the defendant occasionally assigned daily Bible or scripture readings, and L.R. remembered that the children read through the entire Bible twice. He confirmed that the defendant used the biblical story of Lot as an example of how they were expected to behave. The defendant's role in their schooling consisted mainly of supervision and ensuring they stayed focused, while the actual instruction was carried out by L.R. and S.M.R. L.R. explained that, despite these expectations, he did not feel capable of teaching his younger siblings.

¶ 32 L.R. also confirmed that he did not see or even learn of the allegations his sisters made until after he moved out of the home. L.R. testified that after reflecting on his childhood, he now views things he thought were innocent differently. This includes the private massages, where the defendant would require the S.M.R., C.R., and S.R.R. to massage him in the master bedroom, and the other children were explicitly told not to interrupt them. To receive the massages, L.R. explained that the defendant would either summon the girls upstairs himself or text someone in the home to tell them he had told them to come up to the bedroom. L.R. recalled one occasion when he knocked on the master bedroom door and was yelled at by the defendant to go back downstairs. On rare occasions, L.R. would see one of the girls leave the bedroom. When he occasionally saw one of his sisters leave the bedroom, they seemed "visibly distraught," or crying.

12

L.R. testified that he did not know why they were upset or crying as they left the room and that, when he asked, they did not explain. L.R. also testified that he realized the defendant's methods were abusive, such as hitting the children with dowel rods. L.R. also recalled that the defendant would make "very crude comments" regarding sexual behavior in front of all of the children.

¶ 33    Kelly Retzer, the defendant's then-wife, testified that she was in the process of divorcing the defendant. Kelly and the defendant have 12 living children born between 2008 and 2018. During those years, Kelly was either pregnant or caring for a newborn. Her nights were frequently interrupted by breastfeeding and caring for young children, so she often just grabbed naps whenever possible. She described the schedules at home, explaining that the defendant would wake everyone fairly early in the morning, though the timing varied from day to day. After breakfast, the schedule rotated between schoolwork and chores, and on some days the family also had a morning devotional.

¶ 34    Kelly testified that throughout their relationship the defendant "wanted sex all the time," "[s]ometimes more than once a day." She explained that the defendant also asked her to perform oral sex, which she refused, explaining that she did not want to because of an "unpleasant experience" she had in high school with a previous boyfriend.

¶ 35    The court took judicial notice that Kelly filed a petition for dissolution of marriage on January 20, 2023, in De Witt County case No. 23-DC-2. Kelly testified that she "kicked [the defendant] out" in April of 2022, "after learning that he had been sexually inappropriate with at least two of [her] daughters." She did not recall if the petition mentioned sexual abuse. She confirmed that, through counsel, she and the defendant reached an agreement regarding parental responsibility for the children, including the defendant's supervised visitation.

13

¶ 36    After Kelly's testimony, the prosecution rested, and the defense then moved for a directed verdict. The court granted the defendant's motion as to one of the ACSA charges in case No. 23-CF-136, alleging that the defendant placed his mouth on C.R.'s breasts.

¶ 37    The defense called three of the defendant's sons, S.R., J.R., and M.R., to testify. S.R. testified that he does not remember much about his homeschooling and that he now attends public school. He stated that when he or his siblings were in trouble, the defendant would spank them with a wooden rod. When asked whether he ever saw any inappropriate touching at home, he responded, "I don't think so."

¶ 38    J.R. testified that he was unsure whether the defendant moved out of the family home months or years ago. Before attending public school, he was homeschooled, primarily taught by S.M.R. and his parents. He recalled that after the family left their church, they began doing Bible study at home, led by the defendant. He also explained that one of his brothers and his parents would spank the children with wooden rods kept in each downstairs room when they were in trouble. When asked whether he ever saw the defendant inappropriately touching any of his sisters, he answered, "I don't think so."

¶ 39    M.R. testified that living at home was sometimes stressful because he had many responsibilities, and he does not remember much of his childhood before age 15. He described C.R. as lacking "a representation for truthfulness," though he could not recall specific examples. Like his brothers, M.R. was homeschooled before attending public school but does not remember who taught him. He recalled that his mother primarily created the chore lists, though the defendant sometimes did as well. M.R. said he was occasionally allowed to play outside, but not to interact with children outside the family. When asked if he ever saw any inappropriate touching in the home, he responded, "I don't think so." However, he did recall seeing S.M.R. and C.R. massage

14

the defendant in the family and living rooms and remembered S.M.R. sometimes telling him that she would be massaging the defendant upstairs.

¶ 40 The defense also called Detective Morris, who testified that, as part of his investigation, he interviewed various adult family members and observed the minor children's interviews conducted at the Children's Advocacy Center (Advocacy Center) in Clinton, Illinois.

¶ 41 Detective Morris stated that S.M.R. did not tell him her exact age when the defendant had her try on lingerie in the garage, but that she told him she tried on the lingerie four to five times. She explained that the defendant's abuse progressed beyond the lingerie when she was about 12 years old, when she started developing breasts and pubic hair. She also said that the defendant was slow and meticulous in his progression of sexual acts from trying on the lingerie to fondling her under the guise of medical exams to oral sex and penis-to-vagina contact. When explaining the second instance of the oral sex on Mother's Day, she explained that some of her siblings were at her grandparents' house.

¶ 42 Detective Morris also stated that he was present for the interviews of C.R. and S.R.R. at the Advocacy Center. During the interview with C.R., she explained that she was inappropriately touched by the defendant in all areas of the home. In S.R.R.'s interview, she said she could not recall a time that her mother was not in the room during the defendant's massage.

¶ 43 Detective Morris also interviewed L.R. and Kelly. L.R. told him that on one occasion he saw S.M.R. upset after a massage in the master bedroom. L.R. explained that S.M.R. told him she was crying about something that happened in a book. Detective Morris also explained that Kelly had stated that the defendant was interested in knowing "when [their daughters] were having their menstruation."

¶ 44    During cross-examination, Detective Morris explained that in these types of cases, victims can have a difficult time recalling incidents, "especially when they're from several years back." In S.M.R.'s case, she provided more details about certain events as the investigation progressed.

¶ 45    The defense also recalled S.M.R., who testified that she helped her mother fill out a petition for an order of protection against the defendant. In the order, S.M.R. indicated that the penis-to-vagina contact occurred in 2009, when she was 10 years old, but had testified at trial that it occurred when she was around the age of 12. S.M.R. said 2009 was an estimate based on her memory at the time of the order of protection. However, she now recalls it happened when she was around 12 years old. She testified that she has trouble correlating age with grade year because she was homeschooled.

¶ 46    In closing, the State argued that it had proved each count of touching and penetration against the defendant. The State then outlined the undisputed facts of the case, including that the defendant was over 17 years old at the time of the offenses and was a family member of the girls. It further noted that S.M.R. was under the age of 13 until March 22, 2012, and under the age of 18 until March 22, 2017; that C.R. was under the age of 13 until November 21, 2019, and under the age of 18 as of April 16, 2022; and that S.R.R. was also under the age of 13 as of April 16, 2022. The State also asserted that the defendant was able to do these crimes undetected because he had complete control over the household.

¶ 47    The defense argued that the defendant could not have committed the alleged acts because too many people lived in the small house for such conduct to go unnoticed. The defense also contended that the incidents described were implausible given the family's tightly structured daily schedule and the limited opportunities for the defendant to be alone with the girls. The defense further emphasized that only S.M.R., C.R., and S.R.R. claimed to have witnessed the alleged

16

abuse, and none of them could recall when the incidents occurred. The defense further asserted that S.M.R., C.R., and S.R.R.'s motive to fabricate the claims was that he was a terrible father.

¶ 48    In rebuttal, the State argued that the allegations were plausible because of the defendant's control over the family and the children's isolation from school, church, and the public. The State emphasized that the witnesses were credible and, as Detective Morris testified, "it is not uncommon for trauma victims to remember things at different intervals," and to "forget things."

¶ 49    After the closing arguments, the parties agreed to have the admitted photographs sent back to the jury. At 1:30 p.m., the court went into recess while the jury deliberated, and at 2:15 p.m. that same day, the jury returned a verdict finding the defendant guilty on all counts.

¶ 50    On March 7, 2024, the defendant filed a motion for a new trial, arguing that the State failed to prove him guilty beyond a reasonable doubt and that the court erred in denying his motion for a directed verdict. On April 9, 2024, the court held a hearing on the motion and for sentencing. The defendant's argument echoed the arguments made in the motion for a directed verdict, that the jury's verdict was inconsistent with the evidence presented. Given the size of the family and the home, the defense argued it would have been implausible for the abuse to have occurred as testified to. The trial court denied the motion and moved to the sentencing phase of the hearing.

¶ 51    As to the sentencing hearing, the State presented no evidence in aggravation. The defense called the defendant to testify in regard to the mental health treatment he had been receiving at the De Witt County jail. The defendant explained that for five to six weeks leading up to the sentencing hearing, he had been attending weekly mental health appointments with "a representative of Heritage Health." Before his arrest, he was also seeing a psychiatrist at LifeStance Healthcare in Bloomington, Illinois, for his "[g]eneral mental health."

17

¶ 52    The State then argued that because the defendant was convicted of multiple counts of PCSAC against three victims in his cases, pursuant to section 11-1.40(b)(1.2) of the Criminal Code of 2012 (720 ILCS 5/11-1.40(b)(1.2) (West 2022)), a mandatory term of natural life imprisonment applies. Moreover, the State argued that (1) the defendant's conduct caused or threatened serious harm, (2) the sentence is necessary to deter others, and (3) the defendant held a position of trust or supervision over the victims, except as it relates to charges where that is an element of the offense. For the remaining counts, the State asked for sentences ranging from 5 to 10 years in the Illinois Department of Corrections.

¶ 53    The defendant argued that sentencing him to mandatory natural life sentences is unconstitutional under the proportionate penalties clause by distinguishing his case from *People v. Huddleston*, 212 Ill. 2d 107 (2004). Further, the defendant argued that mandatory life sentences deprive the judiciary of its role in sentencing. Moreover, he argued that he has sought treatment for his mental health, he has no prior criminal history, and he had a military career with an honorable discharge.

¶ 54    After arguments, the court found in aggravation that the defendant occupied a position of trust or supervision over the victims. However, it did not consider that as an aggravating factor with respect to the counts alleging he was a family member. The court also found that the defendant's action caused harm to the victims, particularly psychological harm. In mitigation, the court found that the defendant was "gainfully employed" and had no criminal history. Moreover, the court found in mitigation that the defendant was honorably discharged from the Navy and was continuing psychiatric treatment while in custody. The court also noted that it found the victims "very credible." The court then sentenced the defendant to 14 consecutive natural life terms of imprisonment for the PCSAC charges, plus other concurrent and consecutive sentences on the

18

remaining charges, ranging from 4 to 10 years. Thereafter, on April 12, 2024, the defendant filed separate notices of appeal in each case, which were amended on May 8, 2024. This court, on its own motion, consolidated the appeals for decision only.

¶ 55                                II. ANALYSIS

¶ 56                        A. The Sufficiency of the Evidence

¶ 57    The defendant first argues on appeal that the evidence at trial was insufficient to prove that he committed any of the 22 sex offenses he was convicted of beyond a reasonable doubt. To support his argument, he argues that the victims' testimonies lacked credibility because, in his view, there was no corroborating testimony, and it was implausible that no one in the house would have witnessed the offenses.

¶ 58    In this case, the defendant was convicted of 14 counts of PCSAC, 3 counts of CSA, 3 counts of ACSA, 1 count of ISC, and 1 count of SRF. A person commits PCSAC if "that person is 17 years of age or older, and commits an act of contact, however slight, between the sex organ or anus of one person and the part of the body of another for the purpose of sexual gratification or arousal of the victim or the accused, or an act of sexual penetration, and *** the victim is under 13 years of age. 720 ILCS 5/11-1.40(a)(1) (West 2022). A person commits CSA if "that person commits an act of sexual penetration and *** is a family member of the victim, and the victim is under 18 years of age." *Id.* § 11-1.20(a)(3). A person commits ACSA if "that person commits an act of sexual conduct with a victim who is under 18 years of age and the person is a family member." *Id.* § 11-1.60(b). A person commits ISC if that person is 17 years of age or older and if the person with intent that the offense of ACSA, CSA, PCSAC, or ACSA "be committed, knowingly solicits a child or one whom he or she believes to be a child to perform an act of sexual penetration or sexual conduct." *Id.* § 11-6(a). A person commits SRF if they commit "an act of

19

sexual penetration" and the person "knows that he or she is related to the other person." *Id*. § 11-11(a).

¶ 59    In *People v. Rowlands*, this court set forth the applicable standard of review, stating:

"When a defendant challenges the sufficiency of the evidence used to convict that defendant, this court reviews the evidence presented at trial in the light most favorable to the prosecution to determine whether any rational trier of fact could have found beyond a reasonable doubt the essential elements of the crime or crimes of which the defendant was convicted. [Citation.] We will not reverse a criminal conviction unless the evidence presented at trial is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt as to the guilt of the defendant. [Citation.] We allow all reasonable inferences from the record in favor of the prosecution, whether the evidence in the case is direct or circumstantial. [Citation.] There is no requirement that this court disregard inferences that flow from the evidence or that this court search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt. [Citation.] We do not retry the defendant, instead leaving it to the trier of fact to judge the credibility of witnesses, resolve conflicts in the evidence, and draw conclusions based on all the evidence properly before the trier of fact." *People v. Rowlands*, 2022 IL App (5th) 200221, ¶ 43.

¶ 60    "[W]e are mindful of the fact that it is axiomatic in Illinois that the testimony of a single witness, if positive and credible, is sufficient to sustain a criminal conviction, even if the testimony is disputed by the defendant." *Id.* In this case, the defendant's argument on appeal is best summarized as an attack on the credibility of the victims, asserting that their testimony could not support the defendant's guilt in all charges beyond a reasonable doubt. The defendant contends that it was implausible that he touched S.M.R.'s vagina with his mouth at the base of the staircase

20

on two occasions while the rest of the family slept because the schedule admitted into evidence suggested that everyone was awake by 5 a.m. He also asserts that it was "virtually impossible" that he touched C.R.'s vagina frequently in the shower when she had a shared shower time on the schedule. The defendant also argues that both C.R. and S.M.R.'s claims of other unnoticed and inappropriate contact in the common areas of the home are similarly implausible to have gone unnoticed due to the size of their crowded household. Lastly, the defendant contends that S.R.R.'s testimony is insufficient to prove his guilt because it would have been implausible that no one saw or heard the defendant solicit her for sexual intercourse in the kitchen while the rest of the family was in the dining room. The defendant sought to demonstrate that the accounts were uncorroborated and implausible. To do so, the defendant highlighted that no one living in the house witnessed the offenses. The defendant also emphasized that the sisters never believed that anyone other than themselves were being abused. In addition, the defendant pointed out that their mother, who was sometimes asleep in the room, never suspected any wrongdoing. Finally, the defendant noted that the mother even allowed supervised visitation with the children after the allegations were made.

¶ 61    The State argues that corroboration of the witnesses' testimony is not required and that the testimony of a single credible witness is sufficient to support convictions; the determination of witness credibility is best left to the trier of fact. Further, the State asserts that, while corroboration is not required, the victims' accounts, taken together, corroborate one another, their circumstances, and the details of the offenses. Moreover, the State contends that the other witnesses' testimony supported some aspects of the victims' accounts, such as the private massages taking place in the master bedroom, and the other children being told that they were not to disturb them during the

21

massages. Other witnesses' testimony also supported the victims' accounts as it related to the physical discipline in the home, the strict and detailed schedules, and the isolation.

¶ 62 The defendant contends that it was implausible that he touched S.M.R.'s vagina with his mouth at the base of the staircase on two occasions while the rest of the family slept because the schedule admitted into evidence suggested that everyone was awake by 5 a.m. In response to the defendant's argument, the State argues that no contradictions exist between the schedule and S.M.R.'s testimony of those offenses because she testified that the defendant woke her up earlier than the other children on those particular days.

¶ 63 The defendant also contends that it was "virtually impossible" that he touched C.R.'s vagina frequently in the shower when she had a shared shower time on the schedule presented to the jury. In response, the State points out that the shower schedule presented to the jury includes S.M.R., meaning it predates S.M.R.'s move-out in 2020, placing C.R. right around the age at which she testified the conduct began. Further, the younger sister C.R. shared a shower schedule with another sibling, who was around five years old in 2020, and unlikely to notice any sexual actions by the defendant.

¶ 64 The defendant further contends that both C.R. and S.M.R.'s claims of other unnoticed and inappropriate contact in the common areas of the home were unlikely to have gone unnoticed due to the size of their crowded household. In response to the defendant's argument, the State argues that the home environment was not chaotic, with children roaming from room to room at random intervals where they might have seen the inappropriate contact. Rather, all of the children's movements within the home were scheduled from when and what chores and schoolwork to perform, to bathroom breaks and when they were allowed to eat and shower. As L.R. testified, the children received discipline varying from being physically struck with a rod, to having possessions

22

taken away, to having "the small amounts of free time we were given revoked," if they did not perform their allotted tasks, in the allotted time frame. Thus, it was not unsurprising that the other children did not notice any inappropriate acts, as their lives were so regimented by the defendant.

¶ 65    As it relates to their mother, the State argues that it is unsurprising that she did not notice any inappropriate contact because she was virtually, perpetually, pregnant, or with a newborn infant/breast-feeding; her sleep was interrupted most nights, and she was exhausted, mentally and physically, by the end of the day. The State also addresses the assertion that the children's mother allowed supervised visits after the allegations were made, discrediting the believability of the victims' claims. The State points out that Kelly testified that she and defendant were seeing a mediator regarding their divorce, custody, and visitation for defendant with the children, and that the mediator was recommending "some level of supervised visitation" for defendant. As persuasive authority, the State cites to *People v. Chrisman* and *People v. Sabapathy*, where the Second District Appellate Court found that the victims' testimony was not so improbable or unsatisfactory as to create reasonable doubt of the defendant's guilt despite the presence of others in the home in proximity to the abuse. *People v. Chrisman*, 2021 IL App (2d) 190529-U,[1] ¶ 58, and *People v. Sabapathy*, 2025 IL App (2d) 240055-U,[2] ¶ 62.

¶ 66    The State also responds to the defendant's argument that S.R.R.'s testimony is insufficient to prove his guilt because it would have been implausible that no one saw or heard the defendant solicit her for sexual intercourse in the kitchen while the rest of the family was in the dining room. The State points out that S.R.R. and the defendant were alone in the kitchen, and there was no

---

[1]Nonprecedential Rule 23 orders issued on or after January 1, 2021, may be cited for persuasive purposes. Ill. S. Ct. R. 23(e)(1) (eff. Jan. 1, 2021).
[2]Nonprecedential Rule 23 orders issued on or after January 1, 2021, may be cited for persuasive purposes. Ill. S. Ct. R. 23(e)(1) (eff. Jan. 1, 2021).

indication that he spoke loudly enough to be heard by others, two rooms away, even without doors separating the rooms.

¶ 67    In the defendant's reply, he restates and reargues that the victims' testimonies "presented implausible accounts of sexual abuse that are contrary to human experience," and were insufficient to prove him guilty of the charges. As explained above, when reviewing a sufficiency of the evidence claim, this court allows all reasonable inferences from the record in favor of the prosecution, whether the evidence is direct or circumstantial, and will not disregard such reasonable inferences that flow from the evidence. See *Rowlands*, 2022 IL App (5th) 200221, ¶ 43. Moreover, we (1) do not retry the defendant, instead leaving it to the trier of fact to judge the credibility of witnesses, resolve conflicts in the evidence, and draw reasonable inferences based upon all of the evidence properly before the trier of fact, and (2) will not search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt. *Id.* As such, we will not substitute our judgment for that of the trier of fact on questions involving the weight of the evidence or on the credibility of witnesses unless the evidence is "so palpably contrary to the verdict or so unreasonable, improbable or unsatisfactory as to create a reasonable doubt of [the defendant's] guilt." *People v. Abdullah*, 220 Ill. App. 3d 687, 693 (1991).

¶ 68    The evidence that was presented to the jury is described in detail above, and when viewed in the light most favorable to the prosecution, that evidence was sufficient, beyond a reasonable doubt, to sustain the convictions on appeal. It is undisputed that the defendant is the three victims' father and was over the age of 17 between March 22, 2008, and April 16, 2022. It is also undisputed the age of the victims at the time of the offenses. S.M.R. was under the age of 13 until March 22, 2012, and under the age of 18 until March 22, 2017. C.R. was under the age of 13 until November 21, 2019, and under the age of 18 as of April 16, 2022. S.R.R. was also under the age of 13 as of

24

April 16, 2022. Each victim testified in detail about repeated acts of sexual penetration and sexual conduct by the defendant, describing the locations, circumstances, and frequency of the abuse. Their accounts, which spanned more than a decade, reflected the family's controlled and isolated living conditions and were supported in part by the testimony of siblings. The defendant's arguments focus on credibility and perceived implausibility, but credibility determinations are the province of the jury, which heard the victims testify at length and found their accounts credible. Nothing in the record renders their testimony so improbable, unsatisfactory, or contrary to human experience as to create a reasonable doubt.

¶ 69    The defendant also argues that the victims' testimony should be discounted because no additional evidence corroborated their accounts. Our supreme court in *People v. Schott*, 145 Ill. 2d 188, 200-02 (1991), did away with the need for clear and convincing or substantially corroborated testimony from a victim to support a conviction for a sex offense. Our court in *People v. Welton*, 2017 IL App (5th) 150080-U,[3] ¶ 67, interpreted *Schott*'s determination to mean "that the testimony of a complainant in a sex offense case does not need to be supported by circumstantial evidence or corroborated by other witnesses in order to be found credible enough to support a finding of guilt beyond a reasonable doubt." We find no reason to depart from our interpretation of *Schott*. The testimony here provided detailed, direct evidence of the defendant's conduct, and nothing about the absence of additional supporting evidence renders the victims' accounts unreliable or insufficient to support the verdict.

¶ 70    The jury was entitled to assess the victims' credibility, weigh their testimony, and resolve any conflicts in the evidence. Its findings are entitled to deference, and nothing in the record

---

[3]Nonprecedential Rule 23 orders issued on or after January 1, 2021, may be cited for persuasive purposes. Ill. S. Ct. R. 23(e)(1) (eff. Jan. 1, 2021).

demonstrates that the testimony was so improbable, unsatisfactory, or inconsistent as to create a reasonable doubt of the defendant's guilt. The evidence therefore supported the jury's conclusion that the defendant committed each of the charged offenses beyond a reasonable doubt.

¶ 71                          B. Ineffective Assistance of Counsel

¶ 72    The defendant also raises a claim of ineffective assistance of counsel, asserting that his attorney was ineffective by failing to object to photographs admitted at trial. These photographs, taken in the "man corner" of the garage, depicted books containing information on "making fire grenades, 'arson by electronics,' and fighting in the streets."

¶ 73    A criminal defendant has a constitutional right to effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. To determine whether counsel provided ineffective assistance, we look to the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Albanese*, 104 Ill. 2d 504, 526-27 (1984). To prevail on a *Strickland* claim, "a defendant must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defendant." *People v. Cathey*, 2012 IL 111746, ¶ 23 (citing *Strickland*, 466 U.S. at 687). "More specifically, a defendant must show that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Id.* (quoting *Strickland*, 466 U.S. at 694). "[A] defendant must establish both prongs of the *Strickland* test, such that the failure to establish either precludes a finding of ineffective assistance of counsel." *People v. Cherry*, 2016 IL 118728, ¶ 31. We do not need to evaluate whether counsel's performance was deficient if we determine that the defendant cannot show prejudice. *People v. Hale*, 2013 IL 113140, ¶ 17.

¶ 74    "An ineffective-assistance-of-counsel claim which arises from a matter of defense strategy will not support a finding of ineffective representation." *People v. Smith*, 177 Ill. 2d 53, 93 (1997). Mistakes in strategy may not result in ineffective assistance as a defendant is not entitled to perfect representation. *People v. Fuller*, 205 Ill. 2d 308, 331 (2002). Decisions regarding "what matters to object to and when to object" are matters of trial strategy. *People v. Pecoraro*, 175 Ill. 2d 294, 327 (1997).

¶ 75    To demonstrate that the defendant suffered prejudice, "the defendant must show that, 'but for' counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different." *People v. Lacy*, 407 Ill. App. 3d 442, 457 (2011). Prejudice cannot be proven by mere conjecture or speculation under *Strickland. People v. Tuduj*, 2014 IL App (1st) 092536, ¶ 102. The standard of review for determining whether the defendant received ineffective assistance of counsel is *de novo*. *Hale*, 2013 IL 113140, ¶ 15.

¶ 76    The defendant argues that the photographs were not relevant to the charges against him and their admission was unduly prejudicial. He contends that their introduction was used to "vilify" him and present him as a "radical outsider who was not only a danger to his family, but a potential danger to the community."

¶ 77    The State argues that the defendant forfeited this claim by failing to provide an adequate record for review, specifically, by not submitting a bystander's report of the sidebar where the defense objected to the collective admission of the photographs, and by omitting the issue from the posttrial motion. The State further argues that the defendant failed to argue the plain error doctrine as it relates to the unpreserved claim. Moreover, the State contends that counsel's performance was objectively reasonable, and the defendant cannot establish prejudice.

¶ 78    In reply, the defendant argues that the claim is not waived and that even if counsel had objected to the photos during the sidebar, it was ineffective for him to fail to object to them during the testimony and preserve the error for appeal. The defendant reiterates his argument that counsel was ineffective for failing to object to the introduction of the photographs. Further, the defendant contends that even if counsel had provided adequate representation in other areas of the trial, his failure to object to the photographs requires remand for a new trial.

¶ 79    Here, assuming the defendant's claim is not forfeited or waived, his claim fails because he failed to demonstrate that there is a reasonable probability that the result of the proceeding would have been different had the photographs not been admitted. The photographs at issue played no real part in the trial testimony. The only mention of them was an exchange by the State and S.M.R. where S.M.R. stated that the photographs were of books that the defendant would read, and that it was the defendant who would have highlighted the text. As discussed above, the evidence in this case was overwhelming. There was extensive testimony from each of the victims, their mother, and some of their siblings, which, taken together, corroborated the victims' circumstances and the details of the offenses perpetrated by their father, the defendant. The defendant has not demonstrated that there is a reasonable probability that the result of the proceeding would have been different had his counsel objected to the admission of photographs that were irrelevant to the charges against him. Therefore, the defendant has not demonstrated that his defense counsel was ineffective.

¶ 80                                    III. CONCLUSION

¶ 81    For the foregoing reasons, we affirm the judgment of the circuit court of De Witt County.

¶ 82    Affirmed.

28